

NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| SHAHLA NOZARY, | * | Case No. 14-20664- NVA |
| Debtor. | * | (Chapter 7) |
| * * * * * * * | * | |
| NEXTGEAR CAPITAL, INC., | * | |
| Plaintiff, | * | Adv. Pro. No. 15-0092-NVA |
| v. | * | |
| SHAHLA NOZARY, | * | |
| Defendant. | | |
| * * * * * * * | * * * * * |  |

**MEMORANDUM IN SUPPORT OF ORDER GRANTING
NON-DISCHARGEABLE JUDGMENT IN FAVOR OF NEXTGEAR CAPITAL, INC.
<u>IN THE AMOUNT OF $111,108.18 AND DENYING ALL OTHER RELIEF</u>**

The Plaintiff NextGear Capital, Inc. filed a Complaint to Determine Nondischargeability of Debt against Shahla Nozary, the Debtor in this bankruptcy case.   The Debtor owned 50% of Beltway Auto Brokers, Inc., a used car dealer. The Debtor's husband, Khazeyer Molavi owned the remaining 50%.   NextGear provided floorplan financing for Beltway's vehicle inventory.

1

NextGear discovered that Beltway had sold vehicles from its inventory, and failed to turn over the proceeds to NextGear, in violation of the trust language of the parties' contractual agreement. In other words, Beltway sold the vehicles "out of trust."  NextGear then discovered that the remaining vehicles had been removed from the lot. These vehicles remain missing.  NextGear proved that Beltway is liable to it for $1,189,818.25.

Ms. Nozary guaranteed Beltway's obligation to NextGear. By its complaint, NextGear seeks to bar Ms. Nozary's discharge of the guaranty debt pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6).  Section 523(a)(4) excepts from discharge any debt for fraud or defalcation in a fiduciary capacity, embezzlement or larceny.  Section 523(a)(6) excepts any debt for willful and malicious injury by the debtor.  Ms. Nozary claims that she had no fiduciary obligation and no knowledge that vehicles were being sold out of trust or unlawfully removed.  She maintains that her husband ran the business, that she was an owner of Beltway in name only, and that she was not involved in the day-to-day operations of Beltway.

The Court held a trial in this matter.  It appears that Ms. Nozary's husband ran the business and may have committed a fraud on NextGear by selling some vehicles out of trust and by hiding others. It does not appear that Ms. Nozary was involved in the day-to-day business of the auto dealership.  Ms. Nozary became involved in the relationship between NextGear and the auto dealership at some point after the vehicles had already been sold out of trust and after the remaining vehicles had been hidden.  She became involved after NextGear sued Beltway, the Debtor and the Debtor's husband in state court and obtained an injunction regarding proceeds of the vehicles. Her reaction to the situation is her downfall - - she used $111,000 of proceeds of the sale of vehicles that were deposited into her bank account and obtained cashier's checks *after* she knew about the state court lawsuit and indeed *after* she knew about the state court's *injunction*.

2

She is adamant that this was her money and she used it to try to negotiate a resolution with NextGear. When this failed, she deposited the checks into her account, she filed this bankruptcy case and spent the money.

The Court is not convinced that Ms. Nozary was aware of what her husband was doing while he was doing it. There were certainly some red flags and she arguably should have been alerted to the fact that his business practices were not ethical. But the evidence is not sufficient to show that she was complicit in her husband's conduct. She may have been a knowing bystander to bad acts, but she was not an active participant in hiding cars or selling them out of trust.

Mrs. Nozary however, was not ignorant about the cashier's checks. At the time she deposited $111,000 into her bank account and obtained the checks, she knew or should have known that these funds belonged to NextGear and were impressed with its trust. Accordingly, for the reasons explained herein, the Court denies the relief requested by NextGear as to the indebtedness created by the hiding and sale of vehicles out of trust, but grants a non-dischargeable judgment to NextGear against Ms. Nozary in the amount of the cashier's checks in which she was in possession at the time of the filing of her bankruptcy case.

Jurisdictional Statement

As a preliminary matter, the Court must determine whether it has constitutional authority to enter a final judgment. *In Stern v. Marshall*, 564 U.S. 462 (2011) the Supreme Court held that a bankruptcy court must have *both* statutory and constitutional authority to enter final judgment on certain state law claims (finding that the bankruptcy court lacked the judicial power of the United States under Article III of the United States Constitution to enter final judgment on a state law counterclaim).

3

This Court derives its subject matter jurisdiction from 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (relating to this Court's determination of the discharge of certain debts).   Most dischargeability complaints invite a bankruptcy court to answer two separate questions: (1) is there an underlying indebtedness on which the court will enter judgment; and, if so (2) is there a statutory basis to render that judgment/indebtedness non-dischargeable in bankruptcy?  *See In re Dambowsky*, 526 B.R. 590, 600-601 (Bankr. M.D.N.C. 2015).

Often, the first part of this inquiry involves a determination of whether rights and obligations exist under applicable state law.  *Id.*  If so, the court determines whether that liability fulfills the statutory non-dischargeability criteria established by federal bankruptcy law.  *See Id*. Courts that have addressed this issue have determined that the analysis of the underlying state law issue is inextricably intermingled with the ultimate question of dischargeability of the debt such that the entire determination falls handily within the core constitutional jurisdiction of the Article I bankruptcy court. *See Id.* and cases cited therein.

In the wake of *Stern*, this Court, as part of its pre-trial procedure, requests that all parties to an adversary proceeding indicate whether they consent to the entry of final judgment by this Court.  In the instant case, both parties indicated their consent [dkt. no. 19]. Consent to final judgment is valid for *Stern* purposes.  *Wellness Int'l Network, Ltd. v. Sharif,* __U.S.__, 135 S.Ct. 1932, 1939 (2015) ("We hold that Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge"). Consent here was knowing and voluntary.

4

Because this case involves a determination as to the dischargeability of particular claims, and because the parties have consented to the entry of final judgment by this Court, this Court has both statutory and constitutional authority to enter a final judgment.

Findings of Fact

Shahla Nozary filed a petition under chapter 11 of the Bankruptcy Code in this Court on July 3, 2014. That case was converted to chapter 7 on April 28, 2015. Among the claims scheduled by Ms. Nozary was an obligation to NextGear based on a personal guaranty that Ms. Nozary had executed in favor of NextGear.  Ms. Nozary guarantied Beltway's secured obligation to NextGear.  Khazeyer Molavi, Ms. Nozary's husband, also executed a personal guaranty of Beltway's obligation to NextGear.

NextGear filed an Adversary Complaint against Ms. Nozary to declare certain debts non-dischargeable pursuant to §§ 523(a)(4) and 523(a)(6).  It seeks a non-dischargeable judgment against her in the amount of $1,144,001.44, which it alleges includes the principal balance on vehicles that served as its collateral that were sold out of trust, the balance on vehicles that are simply missing, and proceeds impressed with its lien that were never turned over.  NextGear also seeks attorneys' fees.

Beltway was a dealer of used motor vehicles that operated from 2747 Annapolis Road, Hanover, Maryland. Its inventory of automobiles was purchased with proceeds borrowed from NextGear in a "floor plan" financing transaction.[1]

---

[1] In general, floor plan financing is a revolving line of credit that allows a dealer of retail goods, such as motor vehicles, to finance inventory. Each loan advance is made against a specific piece of collateral. As each piece of collateral is sold by the dealer, the loan advance for that specific piece of collateral must be repaid and the dealer may then borrow against the line of credit to add new inventory (*See* testimony of Lisa Long, Regional Director of NextGear. [T:11–12]) (Transcript references refer to dkt no. 38 and a

On September 30, 2013, Beltway executed a Demand Promissory Note and Loan Security Agreement, as amended, (the "Note") in favor of NextGear. [*See* Plaintiff's Exhibit 1].[2] Under the terms of the Note, NextGear granted Beltway a line of credit in the amount of $1,400,000.00 for the purpose of financing Beltway's inventory purchases for its used car lot. [*Id*]. To secure the indebtedness, Beltway granted NextGear a security interest in its assets and proceeds thereof. [*Id*. at Section 2(a)]. NextGear perfected its security interest in the collateral and proceeds by virtue of a UCC-1 financing statement filed with the Maryland Department of Assessments & Taxation, as amended, on March 8, 2013 [Plaintiff's Exhibit 4].

Between October 15, 2013 and April 9, 2014, NextGear advanced funds to Beltway in order to facilitate purchases of inventory. [Plaintiff's Exhibit 5, T:19-20]. As a condition of providing financing, NextGear required Beltway to make the vehicles available for inspection and maintain an accounting of inventory financed by NextGear [T:12-13,23,34].

Over time, Beltway used its credit with NextGear to amass a substantial inventory of used cars and incur more than $1 million in debt [Plaintiff's Exhibit 5]. On April 1, 2014, NextGear performed an audit of Beltway and was satisfied with the results. On the evening of April 15, 2014, NextGear received a phone call from an industry insider advising that it was having financial trouble with Beltway. The next morning David Freeman, the account manager who handled Beltway's loan, drove to the lot and discovered that fifty vehicles were missing

---

reference to the page or pages on which the testimony may be found).

[2] Paragraph 20 of the Note, states, in pertinent part:

> '…the validity, enforceability and interpretation of this Note and the other Loan Documents shall be governed by the internal laws of the State of Indiana without regard to conflicts of Laws provisions hereof" [Plaintiff's Exhibit 1, p.14].

[T:34-35]. As described by Mr. Freeman, the vehicles were removed from Beltway's premises as of April 15, 2014, and his contacts at Beltway refused to disclose the location of the vehicles [T:35-36]. On April 16 and April 17, 2014, NextGear employees asked Mr. Molavi where NextGear's collateral was located. He, too, refused to disclose the location but he admitted that he caused the vehicles to be removed from Beltway's business premises because he believed that the vehicles were subject to repossession. [Plaintiff's Exhibit 7, p. 20].

NextGear declared the Note in default on April 18, 2014.[3] At that time NextGear demanded payment of all sums due under the Note and immediate possession of all of the vehicles and proceeds. According to NextGear's records, there were thirty vehicles missing and unaccounted for at the time it called the Note in default, and twenty vehicles that appeared to have been sold without satisfying NextGear's lien. NextGear repeatedly contacted Beltway seeking information regarding the missing vehicles, as well as information regarding the twenty vehicles that had been sold. Beltway still did not disclose information about the location of the missing thirty vehicles or details about the twenty vehicles sold out of trust. [Plaintiff's Exhibit

---

[3] Beltway had the following obligations under the Note:

- Keep the motor vehicles financed by NextGear at Beltway Auto's place of business.
- Keep complete and accurate records of Beltway Auto's business and promptly, upon demand, provide NextGear copies of such records and any financial information regarding Beltway Auto's business and financial condition.
- Provide NextGear with full access to all collateral.
- Deliver all collateral to NextGear upon request.
- Hold all amounts received from the sale of any motor vehicle financed by NextGear in trust for the sole benefit of NextGear, and remit funds to NextGear within twenty-four hours of Beltway's receipt thereof.

[Plaintiff's Exhibit 1].

7, p. 20-27]. The thirty missing vehicles have not been recovered.[4]

Very little evidence was presented at the trial with respect to Ms. Nozary's involvement with the dealership.[5] Ms. Nozary admitted that she signed a personal guaranty of Beltway's obligations to NextGear, but she claimed that she did not understand that the documents that she signed created obligations on her part until after she was deposed by NextGear in connection with this debt [T:51-53]. Ms. Nozary testified that she did not know initially that she was a part owner of Beltway [T:51-52].

Ms. Nozary has a limited command of English; she is from Iran. She is a high school graduate who attended college for two years, and then taught literature. It was not made clear where or in what language she was educated. Although she appeared to be sincere, she often seemed confused by lines of questions, even those of her own counsel. Ms. Nozary acknowledges that she signed documents at the request of her husband. She signed because she wanted to help him and did so without asking questions. She did not inquire as to her husband's business dealings because she felt that this was what was expected of her in accordance with the cultural norms with which she was familiar. [T:73]

Mr. Freeman handled NextGear's relationship with the dealership. He worked with NextGear on a daily basis [T:34-36], and visited the dealership at least every 30 days [T:19-20]. He never dealt with Ms. Nozary [T:37], never saw her at the dealership [*id*.] and had no

---

[4]  The total principal value of the thirty vehicles placed in Beltway's possession that were financed by NextGear and have not been recovered is approximately $628,013.79. [*See* Plaintiff's Exhibit 5]. The twenty vehicles sold in violation of the Note (sold out of trust) by virtue of having obtained titles were financed in the principal amount of $473,035.47.

[5] Even NextGear is constrained to argue "at best the evidence was unclear as to the level of [Ms. Nozary's] involvement on a day to day basis." [dkt. no. 46, p. 2].

indication that she was involved in the dealership's operations [*id*.].

Lisa Long is a regional director of NextGear who had oversight responsibility for the Beltway account. The first time she had contact with Ms. Nozary was on April 21, 2014 "to let her know the status of the account." [T:17-25]. By April 21, 2014, there were no more vehicles remaining on the dealership lot and the account had already been declared in default.

Ms. Nozary knew that there was a building on Beltway's premises where repairs were done, and she had been to the dealership, but the evidence suggests that she was not involved in the business operations. She did not spend a substantial amount of time at the business premises, but she did go there on occasion, to drop off or pick up her husband. [T:55].

Ms. Nozary admits to having had many different vehicles at her disposal on a revolving basis, but she did not check the glovebox to see to whom each vehicle she was driving was registered. She seemed not to discern that having access to a number of cars was unusual. Her demeanor suggests that she thought this was a perquisite of owning a car dealership, not that she was engaged in fraud.

Ms. Nozary testified she received "rent," either from her husband or Beltway. Her "rent" testimony was confusing at best. At one point, the "rent" seemed to be an allowance for household expenses given to her by her husband. [T:57-59] ("He gave me every month $10,000 for the rent"). The Court attempted to clarify:

> Q (The Court): When you say your husband gave you money for rent. What was the rent? What does that mean?
>
> A (Ms. Nozary): It means I paid the mortgage, I paid everything for the household. For the - - my child. [T:38]

9

Ms. Nozary discussed a $10,000 payment from the dealership on account of its lease of business property:

> Q:    Who owned that property where the business was located?
> A:    My husband and I.
>
> Q:    You owned it together?
>
> A:    Yes.
>
> Q:    And when you refer to the business paying you $10,000 a month in rent, was that the business paying you the rent for being on that piece of property?
>
> A:    Pay - - yes yes.

It seems plausible that Ms. Nozary and her husband received $10,000 a month for the lease obligation of Beltway and the proceeds were then distributed to Ms. Nozary for the purposes of running her household.

To the extent that Ms. Nozary had some level of "involvement" in the matters of the business, it seems to have taken place, if at all, *after* Beltway's misdeeds occurred - - *i.e.*, after the cars were sold out of trust and moved to another location. She was not contacted by Ms. Long until after NextGear became alarmed about the status of its collateral.  She was personally sued (together with her husband and the dealership) in the Maryland State Court on May 14, 2014 after the vehicle sales and disappearances. During the pendency of the state court case, an injunction was entered that severely limited Ms. Nozary's access to cash and inhibited her ability to run her household.  As Ms. Nozary explains, "I was scared. I never get sued before…" [T:64].

It was after-the-fact that Ms. Nozary came to have some culpability. At this point, she

10

had been sued and served by NextGear. She knew there were real troubles. Yet she used funds from her bank account which she must have known had no possible source other than NextGear, and were subject to injunction.

Ms. Nozary testified that she obtained from her bank cashier's checks in different amounts that aggregated in excess of $111,000.[6]  She maintains that she wanted to use the funds to try to settle with NextGear. (she was apparently referring to negotiating a settlement with NextGear of the state court lawsuit).  The source of the funds for the cashier's checks was never definitively established beyond "the bank." Ms. Nozary had not had any employment outside the home since she worked as a hairdresser, ten to twelve years before. No evidence suggested a plausible alternative source for the large sum of money represented by the cashier's checks and the only plausible conclusion is that the $111,000 in cashier's checks was funded with NextGear's collateral. She was personally involved in obtaining cashier's checks in different amounts that could be leveraged in settlement negotiations with NextGear. [T:64].  She knew that use of the underlying funds was enjoined. In fact, she said that she filed this bankruptcy case in order to gain access to money and property.[7]  [T:55, 63].

Ultimately, Ms. Nozary did not use the cashier's checks or their proceeds to pay NextGear or to settle disputes with NextGear; she simply deposited the checks into her account

---

[6] At the time that Ms. Nozary filed her bankruptcy petition, she acknowledges that she had possession of $111,108.18 in cashiers' checks. *See* Schedule B dkt. no 19, case no. 14-20664.

[7] The Court infers that Ms. Nozary's desire to have access to money and property is a reference to the Circuit Court restraining order that NextGear obtained against Beltway, Mr. Molavi and Ms. Nozary personally.  The temporary restraining order forbids Ms. Nozary "from spending, disbursing, … drawing any check … or otherwise transferring any amount from any financial account in which either individual has an interest [Plaintiff's Exhibit 9 at ¶ 2d.]  The temporary restraining order had a duration of ten days, but was later extended (by consent) through June 30, 2014. [Plaintiff's Exhibit 10].

11

and spent the proceeds without bankruptcy court permission. *See* docket in main case, [T:64-67, 71].

Establishing the Underlying Debt

Before it can establish that a debt is nondischargeable, NextGear must first carry its burden to establish that a debt is owed to it. NextGear has unequivocally established that Beltway is obligated to it for an amount certain and that Ms. Nozary is liable for that debt under her personal guaranty.

NextGear filed its proof of claim (claim no. 7) in this case on October 10, 2014 in the amount of $1,144,001.44  The Debtor has not filed an objection to that claim.  A proof of claim *prima facie* demonstrates the validity and amount of the claim unless put in dispute.  *In re Harford Sands Inc*., 372 F.3d 637 (4th Cir. 2004).

Further, NextGear established its claim at trial through the testimony of Ms. Long and the exhibits admitted in conjunction with her testimony. NextGear demonstrated the existence of its secured claim against Beltway, and the personal liability of Ms. Nozary on that claim  [*See* Plaintiff's Exhibits 3,5].  Through Ms. Long, NextGear demonstrated that its guaranty claim against Ms. Nozary, including appropriate fees and costs totals $1,189,818.25 as of February 22, 2016.

Ms. Nozary listed a personal obligation to NextGear on her bankruptcy Schedule F [dkt no. 19] in the amount of $1,367,825.  Although she marked the column on her schedules indicating that the claim is "contingent, unliquidated and disputed," she did nothing to follow up, and mounted no material defense to the evidence at trial. [8]

---

[8] The summary disposition of Ms. Nozary's underlying liability also makes quick work of what could

Nondischargeability - Legal Standard

NextGear brings its nondischargeability action against Ms. Nozary under §§ 523(a)(4) and 523(a)(6) of the Bankruptcy Code.

Section 523 (a)(4) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

Section 523 (a)(6) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity

As Plaintiff, NextGear carries the burden of proving the elements of §§523(a)(4) or 523(a)(6), by a preponderance of the evidence.   In determining whether a debt falls within one of the exceptions to discharge provided by §523, the statute should be strictly construed against the objecting creditor and liberally in favor of the debtor. *Grogan v. Garner,* 498 U.S. 279, (1991). *See also, In re White*, 128 Fed.Appx. 994, 998, 2005 WL 984195, *3 (4th Cir. 2005)*,

---

have been fairly sticky choice of law issues. The Note and the guaranties contain an Indiana choice of law clause and were signed in Virginia [Plaintiff's Exhibits 1-3]. The car dealership was located in Maryland and NextGear's security interests were recorded and filed with the Maryland State Department of Assessment and Taxation. [Plaintiff's Exhibit 5].   *See* jurisdictional discussion, *supra* and cited authorities for the proposition that the state law aspects of a dischargeability matter arise in the determination of the underlying liability.

*citing Grogan v. Garner,* 498 U.S. 279, 286 (1991) (Exceptions to discharge are narrowly construed in order to further the Bankruptcy Code's policy of providing a fresh start to debtors).

<u>Liability under  11 U.S.C. §523 (a)(4)</u>

To find a debt non-dischargeable under §523 (a)(4), the Court must find that the debtor (Ms. Nozary) engaged in fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny.  The almost singular focus of NextGear, at trial and in its papers, is its position that Ms. Nozary is liable as a fiduciary.

There are two ways Ms. Nozary could have become a fiduciary with respect to NextGear and its collateral and proceeds: First, she could have signed a contractual trust obligation that directly impressed fiduciary responsibilities on her. Second, she could have become impressed with Beltways' fiduciary obligations to NextGear.

NextGear makes no allegation that the personal guaranty document signed by Ms. Nozary contains trust or fiduciary obligations in favor of NextGear, and the document *does not* contain any language creating such obligations.  It is a plain commercial guaranty of Beltway's obligations.  This, without more, does not put Ms. Nozary in a fiduciary position as to NextGear. *See In re Strack*, 524 F.3d 493 (4th Cir. 2008).

The Fourth Circuit's decision in *Strack* provides guidance as to whether, and in what circumstances, an individual owner of a corporation (like Ms. Nozary) can be held to account for a fiduciary breach by a corporation.  In *Strack*, as in the instant case, a dealership entered into a floor-plan financing agreement that created a trust and the owner of the dealership had personally guaranteed the indebtedness. *Id*. at 495.  The *Strack* Court determined that there was a fiduciary duty owing from the corporation to the floor-plan financer because, just as in this case, the financing agreement required that the proceeds of sale be segregated and placed into trust for the

14

benefit of the floor-plan financer.

The language of the loan agreement was held sufficient to create a trust and a fiduciary relationship between the *dealership and the financer* with respect to the proceeds of sale. *Id*. at 498-99. (emphasis added). Here too, the language in the note creates a fiduciary relationship between NextGear and Beltway. *See infra*. The more complicated part of this analysis is determining whether the *owner* of the dealership - - in this case Ms. Nozary - - should be impressed with the fiduciary obligations the dealership owes to its lender such that the obligations should be rendered non-dischargeable as to the individual owner.

In *Strack*, the Fourth Circuit defined this inquiry as "whether [the owner's] *personal* indebtedness to [the floor plan financer], arising out of his guarantee … is therefore non-dischargeable under § 523(a)(4)." *Id*. at 500 (emphasis in original). In order to determine whether the owner of the dealership should be held liable (and his debt held non-dischargeable), the Fourth Circuit cited *In re Ellison*, 296 F.3d 266 (4th Cir. 2002) with approval and applied the following factors from that case:[9] (1) whether the debtor personally guaranteed the indebtedness; (2) whether the indebtedness arose due to defalcation or "the breach of a fiduciary relationship between the two corporations"; (3) whether the debtor was "personally responsible for the conduct that gave rise" to the corporate breach or defalcation; and (4) whether the debtor's "conduct amounted to a breach of their fiduciary duty" to the corporation. *Id*. All four of all of these factors must be present in order for a debt to be non-dischargeable as to a guarantor. *See Id*.

The Court now turns to the *Ellison* factors, as adopted in *Strack,* to determine whether

_____

[9] Both NextGear and Ms. Nozary rely on *Ellison* as controlling.

Ms. Nozary's obligation to NextGear is non-dischargeable under § 523 (a)(4).

Factor 1: The Debtor Personally Guaranteed the Indebtedness

It is undisputed that Ms. Nozary guaranteed the indebtedness.  She executed a personal guaranty making her liable on the debt by the dealership to NextGear.[10]  This factor has been met.[11]

Factor 2: The Indebtedness Arose Due to Defalcation<br>or the Breach of a Fiduciary Relationship Between the Two Corporations

By virtue of the Note executed by Beltway and the obligations under it, a fiduciary relationship was created between the two corporations – *i.e.* between NextGear and Beltway. Specifically, the Note executed by Beltway required that Beltway "hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received *in trust* for the sole benefit of and for Lender…" [Plaintiff's Exhibit 1, ¶ 4(f)]  (emphasis added).

There is ample evidence to demonstrate that Beltway failed to remit the proceeds of sale of collateral that secured the line from NextGear.  Moreover, when NextGear inquired as to the whereabouts of the proceeds and came to collect its remaining collateral, the money and the vehicles had been moved beyond its reach.  This was a breach of the agreement between the parties and, as in the *Strack* case, NextGear presented evidence that the *corporate borrower*

---

[10]  Ms. Nozary was not contractually bound to be a fiduciary.  The signing of the guaranty did not  place her in a fiduciary capacity.  *Ellison, supra* at 270 (simply guaranteeing a debt does not place a guarantor in a fiduciary relationship)

[11] NextGear argues that Ms. Nozary acted in a fiduciary capacity solely by virtue of being a member of the LLC.  This is true – but she only acts in a fiduciary capacity with respect to the officers, directors and shareholders of the corporation. *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 240 (Ind.2001) (*quoting Hartung v. Architects Hartung/Odle/Burke, Inc.*, 157 Ind.App. 546, 301 N.E.2d 240, 243 (1973)).  ("The fiduciary must deal fairly, honestly, and openly with his corporation and fellow stockholders. He must not be distracted from the performance of his official duties by personal interests." ).

16

under the loan documents had fiduciary responsibilities to NextGear. Accordingly, this factor has been satisfied.

Factor 3: Whether the Debtor was "Personally Responsible for the<br>Conduct that Gave Rise" to the Corporate Breach or Defalcation

There is simply no evidence that Ms. Nozary was involved in the sale of vehicles out of trust or in the obfuscation of NextGear's collateral. Nobody at NextGear ever dealt with her (short of initially obtaining her signature on the guaranty), and the NextGear account executive did not recall that she was ever at the dealership or involved in any of its operations. There is nothing to suggest that her signature on the guaranty was anything other than *pro forma*.

NextGear maintains that Ms. Nozary must have known that all of the money she was using came from the auto dealership because her husband had no other source of funds. Even if she did, however, it does not necessarily follow that she was on notice that her husband obtained these funds through fraudulent dealings or that she knew (or was on notice that) the dealership failed to pay NextGear upon the sale or removal of its collateral. There is no evidence to indicate that she knew about this scheme, much less that she was responsible for carrying it out.

NextGear suggests that Ms. Nozary should have been alerted that something was wrong when she received a rent payment early. Ms. Nozary testified that the dealership was never late with a payment. Thus, she explained, there was no reason for her to believe that anything was amiss financially at the dealership. The evidence shows that the dealership at least once tendered a check for $10,000 to Ms. Nozary before it was due and that Ms. Nozary accepted it without inquiry. There is nothing inherently fraudulent about accepting rent paid early. Nothing was presented to suggest that Ms. Nozary gleaned from the early rent payment that a scheme was afoot at the business.

17

The record does not support the conclusion that Ms. Nozary's conduct and decisions were responsible for the dealership breaching its duties to NextGear.  Unlike the actions of the debtor in *Ellison*, Ms. Nozary's actions did not give rise to the corporate breach. She was not responsible for the actions taken by Beltway to sell vehicles out of trust and hide them. Accordingly, this factor has *not* been satisfied with respect to NextGear's claims for breach that resulted from the unauthorized movement or sale out of trust of NextGear's collateral.

Factor Four: Whether Ms. Nozary's  Conduct
<u>Amounted to a Breach of Her Fiduciary Duty to the Corporation</u>

The owner of an LLC owes a fiduciary duty to the corporation she owns.[12]   Ms.  Nozary owed a fiduciary duty to Beltway. The inquiry here is whether *her* conduct breached that duty. As has been stated, Ms. Nozary had limited involvement with the operation of the dealership. It was not her conduct that caused vehicles to be sold out of trust and hidden.  *See supra*. Accordingly, these actions cannot be attributed to her as a breach of duty to Beltway.

---

[12] The NextGear/Beltway Loan Documents (and Nozary guaranty) specify that Indiana law applies.  The documents were executed in Virginia. [Plaintiff's Exhibits 1-3]. The dealership was located in Maryland and NextGear's security interests were recorded and filed with the Maryland State Department of Assessments and Taxation. [Plaintiff's Exhibit 5].The parties in this case are unsettled about applicable state law. Here, however, it makes no difference.  The laws of all three states support the conclusion that the owner of an LLC (like Ms. Nozary) owes a fiduciary duty to the corporation (like Beltway).  *See, e.g.*, *Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 991 (Ind. 1998) ("Indiana courts have characterized closely-held corporations as "incorporated partnerships" and as such have imposed a fiduciary duty upon shareholding "partners" to deal fairly not only with the corporation but with fellow shareholders as well"); *Flippo v. CSC Assocs.*, 262 Va. 48 (2001) (clarifying that a member of an LLC has a fiduciary duty to the LLC itself); *Lyon v. Campbell*, 120 Md.App. 412, 440 (1988) ("When a corporation has just a few shareholders, that is, when just a small number of persons own shares in the corporation and the corporation is run like a partnership among the shareholders, then the shareholders owe the corporation and the other shareholders duties of loyalty, good faith, and fair dealing, as well as a duty not to injure the corporation.") *See also Bontempo v. Lare*, 444 Md. 344, 393 (Md. 2015) ("courts often consider all owners in close corporations to have fiduciary duties similar to partnerships") (citing dissent).

However, once she took control of proceeds of NextGear collateral, converted them to cashier's checks and spent the funds, her conduct crossed the line. Ms. Nozary personally deposited and used $111,108.18 in trust funds. She personally obtained the cashier's checks, deposited them in her own bank account, and later spent the funds.   At the time she filed this bankruptcy case, she knew about NextGear's allegations that Beltway had sold vehicles out of trust and had failed to turn proceeds over to NextGear.  She knew that NextGear was suing the dealership and had obtained a state court injunction against the dissipation of any proceeds of the dealership. Yet, she attempted to use NextGear's own proceeds to settle with it. Her own conduct in using the $111,108.18 was a breach of her duty to the dealership.

Her conduct in violation of a duty to Beltway is not, however, sufficient to establish § 523 (a) (4) nondischargeability.  In following the *Ellison* test, the Fourth Circuit in *Strack* has required that *all* four factors be satisfied.


Embezzlement and Larceny Under § 523 (a)(4)

Section 523 (a)(4) also excepts from discharge any debt for "embezzlement or larceny." The Plaintiff did not plead allegations of embezzlement or larceny in Count I (the § 523(a)(4) count) of its Complaint.   The words "embezzlement" and "larceny" are mentioned in the Complaint seemingly only because they are part of the statute.   NextGear makes no factual averments with respect to embezzlement or larceny and states only the following in concluding Count I:


> 30.   Defendant is therefore liable to NextGear Capital for fraud or defalcation in a fiduciary capacity.

> 31. NextGear Capital's damages under this Count are the amount of the Secured Proceeds converted by Defendant, or converted at Defendant's direction, in an amount to be proven at trial.

When queried by the Court at trial, NextGear's counsel stated that he did mean to pursue embezzlement and larceny, though he never amended the Complaint.

Whether properly before the Court or not, NextGear has not proved larceny or embezzlement.  "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *In re Davis*, 494 B.R. 842 (Bankr. D.S.C. 2013).  NextGear did not entrust any property to Ms. Nozary.

Larceny for the purpose of § 523 (a)(4) is defined by federal common law, and requires more than fraud - - it requires an intent to steal. *In re Ghaemi*, 492 B.R. 321 (D.Colo. 2013). Cases that find that a debtor has committed larceny under §523(a)(4) speak of the requisite "felonious conversion."  *See, e.g., In re Davis*, 262 B.R 663 (Bankr. E.D. Va. 2001).  NextGear did not plead, prove or brief this sufficiently for the Court to find that Ms. Nozary had felonious intent. NextGear has neither properly pleaded nor demonstrated at trial that this debt is non-dischargeable under § 523(a)(4) as a debt for fraud or embezzlement

Willful and Malicious Injury under 11 U.S.C. §523 (a)(6).

In order to support a cause of action under 523 (a) (6), a creditor must show that: (1) the debtor willfully caused an injury to the person or property interest of the creditor; and (2)  the debtor's "willful" acts were undertaken in a "malicious" manner.  The terms "willful" and "malicious" are separate elements, both of which need be proven by a preponderance of

evidence. *See St. Paul Fire & Marine, Ins. Co. v. Vaughn,* 770 F.2d 1003,1010 (4th Cir. 1985); *Grogan v. Garner*, *supra*.

The word "willful" in the statute modifies "injury." To prevail, the creditor must prove that the debtor intended to injure - - not simply that the debtor intended to perform the act that ultimately caused injury. *See Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998) (The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury.) (emphasis in original).

In the context of a §523 (a)(6) conversion case like the instant case, "malice" means "wrongfully and without cause."  Malice can be shown by "exercise of dominion and control over funds that [the debtor] knew belonged to another." *In re Stanley*, 66 F.3d 664 (4th Cir. 1995).  This stands in contrast to the tort of conversion in which one may be liable for conversion even though one had no knowledge that another's ownership rights were being traversed. *See Geiger, supra*, at 61.

Ms. Nozary (not the dealership and not her husband) is the debtor and there is insufficient evidence to find that she personally participated in the sale of the vehicles out of trust or that she was involved in moving them.  The corporation of which she is an owner may have engaged in fraudulent conduct, but corporate boundaries are to be respected. *Hemel v. Pontier,* 165 B.R. 797, 799 (Bankr. Md. 1994). (A corporate officer is not personally liable for a tort unless that officer specifically committed, participated or cooperated in the tort). *See also, In re Rigoroso*, 453 B.R. 612 (Bankr. D.S.C. 2011)(In a floor plan financing case, commenting that, "[o]ther courts have routinely found that a debtor who is an officer or director of a corporation can be held personally liable for the tortious acts of the corporation when he actively participated in

those acts."); *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir. 1987) ("a personal debtor who, as an officer of a corporation, actively participates in the conversion of property which is subject to the security interest of a third party, is personally liable to said party and thus the debt is nondischargeable pursuant to section 523(a)(6))"[13]

As has been discussed, Ms. Nozary did not participate in the sale of vehicles out of trust or the movement of them to another site. Her personal guaranty liability to NextGear is not rendered non-dischargeable based on actions in which she did not participate and does not fall into the category of "willful and malicious injury" under § 523(a)(6).

Although Ms. Nozary did not sell or move the vehicles, she did however, personally take control of their cash proceeds at a time when she had knowledge that NextGear had the superior ownership interest. If she did not know before, she did gain knowledge of NextGear's interest and rights by virtue of being a party to a state court lawsuit that resulted in an injunction on her use of proceeds and bank accounts. She took $111,108.18 of proceeds, converted the funds to cashier's checks and ultimately spent the funds. Her actions and the context in which she acted are very similar to the scenario addressed by the court in *In re Stelluti*, 94 F.3d 84 (2d Cir. 1996).

In *Stelluti*, the Second Circuit upheld the non-dischargeability of a personal guaranty of floor plan financing debt against the wife of the primary malefactor under § 523 (a)(6). After the husband sold the vehicles out of trust, he took the funds and deposited them in a personal account in order to gain some leverage against the financer. *Id*. at 85. The husband told his wife

---

[13] The cases cited by NextGear regarding imputation are misplaced - - they deal with partnerships and not corporations. *See, e.g.*, *Matter of Luce*, 960 F.2d 1277 (5th Cir. 1992) (husband's fraud imputed to partner/wife to make debt non-dischargeable as to wife, even though there was no evidence she knew about or participated in the fraud); *In re Simone,* 509 B.R. 6 (D.Md 2014) (husband and wife acting together as partnership).

about the transfer of funds and that the dealership was in debt. *Id*. at 85- 86. The wife then obtained bank checks and used them for various purposes, including opening new accounts and paying off debt that the couple had personally guaranteed. *Id*. She testified that she really did not understand why her husband had asked her to open new accounts and drive so far to do it, but she went along with it. *Id*. The Second Circuit commented that this behavior was sufficient to show malice on the part of the wife. *Id*. at 88. The court found that even if she did not know that the particular funds she was depositing into new accounts were the property of the floor plan financer, she knew about the existence of the debt to the floor plan financer and she intentionally diverted money away from the reach of the creditor. *Id*. Thus, the court found the wife's obligation to be non-dischargeable pursuant to § 523 (a)(6).

In the instant case, the culpability of Ms. Nozary is even clearer than that of the wife/guarantor in *Stelluti*. Ms. Nozary, by virtue of the state court lawsuit and injunction, knew that the dealership owed money to NextGear and, as of the time of issuance of the state court injunction, she also knew that all of the funds of the dealership were impressed with a lien. She had the checks issued anyway and even tried to negotiate with NextGear using its own money. When that didn't work, she simply deposited the proceeds of the checks into her account and spent them for household purposes. This meets the criteria for both willful and malicious and is grounds for holding that Ms. Nozary's personal guaranty liability is non-dischargeable under § 523 (a)(6) to the extent of (only) the amount of the cashier's checks ($111,108.18).

NextGear's Request for Attorneys' Fees

NextGear's request for attorneys' fees is denied. NextGear made no showing that its fees fulfill the non-dischargeability criteria, and the statute does not provide for fees. In the absence of a statutory provision expressly allowing fees (or the underlying fees themselves being

23

rendered non-dischargeable), this Court employs the American Rule. *See, e.g., in re Gagle*, 230 B.R. 174, 185 (Bankr. D.Utah 1999) ("Nothing in § 523(a)(6) indicates that Congress intended the prevailing party to be awarded fees.")

    A conforming order will issue separately.


    cc:    All parties
              All counsel

**END OF MEMORANDUM**